UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 25-mj-08541-Maynard

FILED BY ___MB___ D.C.
Oct 1, 2025
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FTP

UNITED STATES of AMERICA

vs.

EDGAR GERMAN OLAIS MADERO,

    Defendant.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek M. Maynard)? NO

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)? NO

3. Did this matter involve the participation of or consultation with now Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? NO

4. Did this matter involve the participation of or consultation with now Magistrate Judge Marta Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? NO

                              Respectfully submitted,

                              JASON A. REDING QUIÑONES
                              UNITED STATES ATTORNEY

By: _____
      Brian D. Ralston
      Assistant United States Attorney
      Court ID No.: A5502727
      500 S. Australian Avenue, Suite 400
      West Palm Beach, Florida 33401
      Telephone: (561) 820-8711
      Email: Brian.Ralston@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

FILED BY __MB__ D.C.

Oct 1, 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FTP

| United States of America | ) |
|---|---|
| v. | ) |
|  | ) Case No. 25-mj-08541-Maynard |
| EDGAR GERMAN OLAIS MADERO | ) |
|  | ) |
|  | ) |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __August 10-27, 2025__ in the county of __Palm Beach__ in the
__Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(vi) | Possession with Intent to Distribute a Controlled Substance (Fentanyl) |

This criminal complaint is based on these facts:
See Attached Affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Roberto Delgado-Mendez, DEA
*Printed name and title*

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by __Telephone (Facetime)__

Date: 10/1/25

_____
*Judge's signature*

City and state: __West Palm Beach, Florida__   Shaniek M. Maynard United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Roberto Delgado-Mendez, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. This affidavit is submitted in support of a criminal complaint charging Edger German OLAIS MADERO with Possession with Intent to Distribute a controlled substance, namely counterfeit Oxycodone pills containing a mixture or substance containing a detectable amount of fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(viii).

2. I am a Special Agent of the Drug Enforcement Administration ("DEA") assigned to the West Palm Beach District Office (WPBDO), Enforcement Group 2 (EG2). As such, I am an investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516(1).

3. My educational background includes a Bachelor of Science degree in Political Science and Psychology from the College of Social Sciences and Public Policy at the Florida State University. In September 2023, I completed Basic Agent Training at the DEA Training Academy in Quantico, Virginia. While attending Basic Agent Training, I received instruction on topics including, but not limited to, drug identification, current drug distribution trends, undercover operations, confidential source management, and surveillance techniques.

4. I have received extensive training in conducting narcotics investigations and in identifying the means and methods used by narcotics traffickers. I have conducted or participated in numerous investigations of this nature. Much of this training and experience has been directed at the detection, investigation, seizure and surveillance of individuals involved in the

manufacture, possession and distribution of controlled substances. Through my training, education and experience, which has included debriefing cooperating drug traffickers, acting in an undercover capacity, conducting searches of locations where drugs and money have been found, and conducting surveillance on individuals engaged in drug trafficking, I have learned the various methods, packaging materials, and actions that drug traffickers utilize to conduct their illegal business and efforts that drug traffickers take to thwart law enforcement.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## FACTS IN SUPPORT OF PROBABLE CAUSE

6. In early August 2025, a DEA Task Force Officer acting in an undercover capacity ("UC"), had a series of WhatsApp calls and messages with Edger German OLAIS MADERO. The UC asked OLAIS MADERO if he could sell 2,000 counterfeit Oxycodone pills to the UC in West Palm Beach, Florida. OLAIS MADERO agreed to sell 2,000 counterfeit Oxycodone pills in exchange for $8,000 United States currency ("USC") and to meet the UC in West Palm Beach, FL on August 10, 2025. Based on the UC's training and experience, his knowledge of the overall investigation, and the nature of the calls and messages, the UC understood that the counterfeit Oxycodone pills would contain fentanyl.

7. During a series of WhatsApp telephone calls and text messages on August 10, 2025, the UC and OLAIS MADERO agreed to meet at the Lowes' parking lot located at 4835 Okeechobee Blvd, West Palm Beach, FL 33417, at approximately 12:00 p.m. to conduct the transaction for the 2,000 counterfeit Oxycodone pills.

2

8. On the same date, at approximately 3:07 p.m., OLAIS MADERO arrived in a Chevrolet Cruze, and parked in the PNC bank parking lot located at 4835 Okeechobee Blvd, West Palm Beach, FL, which is located next to the Lowes parking lot. Law enforcement witnessed OLAIS MADERO walking to the UC vehicle and entering the front passenger side of the UC's vehicle.

9. During the meeting with the UC, OLAIS MADERO told the UC that the pills were in the area and that OLAIS MADERO would have to pick them up. OLAIS MADERO and the UC agreed to meet later in the day when OLAIS MADERO had the counterfeit Oxycodone pills to conduct the transaction.

10. At approximately 5:12 p.m., a West Palm Beach Police Department Officer initiated a stop on the Cruze for impeding the flow of traffic. The stop occurred near Quadrille Boulevard and the intersection of Hibiscus Street. Law enforcement identified OLAIS MADERO through his Instituto Nacional Electoral Credencial Para Voter card with his photograph. The Officer gave OLAIS MADERO a verbal warning and let him go.

11. At approximately 7:01 p.m., the UC placed a WhatsApp phone call to OLAIS MADERO. During the call, OLAIS MADERO told the UC that he had the pills with him. OLAIS MADERO told the UC that he had to count the pills. The UC and OLAIS MADERO agreed to meet back at the Lowes parking lot.

12. At approximately 7:29 p.m., law enforcement saw the Cruze arrive in the Lowes parking lot and park close to the UC vehicle. OLAIS MADERO then exited the Cruze and entered the front passenger side of the UC's vehicle. OLAIS MADERO handed the UC a cylindrical shaped bundle wrapped in black tape and green plastic wrap. The UC peeled back the plastic wrap and confirmed the bundle contained pills. The UC then gave OLAIS MADERO

$8,000 of USC of DEA Official Advanced Funds. OLAIS MADERO told the UC that there were an additional 8,000 pills being kept by the individual who OLAIS MADERO had picked up the pills from.

13. At approximately 7:42 p.m., after the transaction was completed, law enforcement saw OLAIS MADERO exit the UC's vehicle and leave the area.

14. Law enforcement field tested the pills with negative results with the presence of Fentanyl. The DEA Southeast Laboratory has since analyzed a representative sample of the purchased pills and confirmed them to contain N-Phenyl-N-[1-(2-phenylethyl)-4- piperidinyl] propanamide (Fentanyl) with a net weight of 203.6 grams.

15. Following the above-described transaction, the UC remained in contact with OLAIS MADERO. During those communications, OLAIS MADERO agreed to give the UC a sample of "tar," which the UC understood from his training and experience to be a reference to black tar heroin. The UC and OLAIS MADERO agreed to meet at a restaurant located in West Palm Beach, FL on August 19, 2025.

16. At approximately 12:09 p.m., the UC arrived at the restaurant and parked the UC vehicle. OLAIS MADERO exited the restaurant, walked over to the UC vehicle where he greeted the UC, and entered the UC vehicle. Inside the vehicle, OLAIS MADERO handed one clear plastic baggie containing a black tar looking substance to the UC. OLAIS MADERO also told the UC that the driver of the Cruze, who was still inside the Cruze at this point, was one of OLAIS MADERO's workers. The UC understood this to mean that the driver worked for OLAIS MADERO in the distribution of controlled substances.

17. At approximately 12:32 p.m., OLAIS MADERO and the UC exited the UC vehicle and went into the restaurant. Soon after, the driver of the Cruze exited the Cruze, entered the restaurant and joined OLAIS MADERO and the UC.

18. Following the transaction, investigators field-tested the sample of "tar" with positive results for the presence of heroin. The suspected heroin was shipped to the DEA Southeast laboratory for official laboratory analysis. The suspected heroin had a seized net weight of 31.5 grams.

19. On August 27, 2025, the UC had a series of WhatsApp communications with OLAIS MADERO. The UC asked OLAIS MADERO if he could sell additional 8,000 counterfeit Oxycodone pills to the UC in West Palm Beach, Florida. OLAIS MADERO agreed to sell 8,000 counterfeit Oxycodone pills for $18,400 USC and to meet the UC in West Palm Beach, FL on August 27, 2025.

20. On August 27, 2025, the UC and OLAIS MADERO agreed to meet at the Taqueria Jalisco restaurant located at 4678 Forest Hill Blvd, West Palm Beach, FL at approximately 12:00 p.m. to conduct the transaction for the 8,000 counterfeit Oxycodone pills.

21. At approximately 11:44 a.m., surveillance units witnessed OLAIS MADERO drive into the shopping plaza where Taqueria Jalisco restaurant is located and eventually park in a parking spot located on the southeast corner of the building. Shortly after, surveillance units observed OLAIS MADERO exit the Cruze and enter the restaurant.

22. Soon after, surveillance units observed OLAIS MADERO exit the restaurant and walk to the UC vehicle where he opened the front passenger door and stood in the doorway. OLAIS Madero told the UC that he was going to get the UC's clothes (referring to the pills) and closed the door. Surveillance units observed OLAIS MADERO open the door a second time, talk

to the UC, and close the door. OLAIS MADERO then walk in front of the UC vehicle and over to the Cruze where he opened the front passenger door of the Cruze and reached inside. OLAIS MADERO pulled a light in color bag out of the Cruze, closed the door, and walked back to the UC vehicle front passenger door. Surveillance units observed OLAIS MADERO open the door and get inside the UC vehicle. OLAIS MADERO handed the UC the light in color bag. The UC looked inside the bag and observed four (4) cylindrical shaped bundles wrapped in plastic and black tape. The UC retrieved one of the bundles to confirm it contained the pills. OLAIS Madero told the UC that OLAIS MADERO wanted to rent a house so next time the UC could count the pills with OLAIS MADERO there. The UC then handed $18,400 of DEA Official Advanced Funds to OLAIS MADERO.

23. OLAIS Madero told the UC that OLAIS MADERO had crystal methamphetamine in Arizona. The UC told OLAIS Madero that the UC was going to need 30,000 to 40,000 more pills. OLAIS Madero told the UC that OLAIS MADERO could have the additional 40,000 pills in a few days.

24. At approximately 12:15 p.m., surveillance units observed the front passenger door open and OLAIS MADERO exit the UC vehicle. Surveillance units observed OLAIS MADERO stop in the doorway, talk to the UC, and close the door. Surveillance units observed OLAIS MADERO walk towards the Cruze. OLAIS MADERO opened the front passenger door of the Cruze and put the red object into the Cruze. OLAIS MADERO then walked into the restaurant through the southern door.

25. Following the transaction, investigators field-tested a pill from the 4 cylindrical shaped bundles of pills with positive results for the presence of Fentanyl. The suspected fentanyl

was shipped to the DEA Southeast laboratory for official laboratory analysis. The suspected fentanyl had a seized net weight of 265 grams.

26. In summary, over the course of two sperate occasions OLAIS MADERO sold approximately 10,000 counterfeit Oxycodone pills to a UC that contained fentanyl. On another occasion, OLAIS MADERO provided a sample of heroin to the UC.

## **CONCLUSION**

27. Based on the foregoing, your affiant respectfully submits that there is probable cause to believe that Edgar German OLAIS MADERO has committed the criminal offense of Possession with Intent to Distribute a Controlled Substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(vi).

FURTHER YOUR AFFIANT SAITH NAUGHT.

_____
Roberto Delgado-Mendez
Special Agent
Drug Enforcement Administration

Sworn and Attested to me by Applicant by Facetime pursuant to Fed. R. Crim. P. 4(d) and 4.1 this 1st day of ~~September~~ 2025.
October

_____
Hon. Shaniek M. Maynard
United States Magistrate Judge
Southern District of Florida

7

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:** Edgar German Olais Madero

**Case No:** 25-mj-08541-Maynard

Count#: 1
Possession with Intent to Distribute a Controlled Substance (fentanyl)

21 U.S.C. § 841(a)(1), (b)(1)(A)(vi)

* **Max. Term of Imprisonment:** Life
* **Mandatory Min. Term of Imprisonment (if applicable):** 10 years
* **Max. Supervised Release:** 5 years to life
* **Max. Fine:** $10,000,000
* **Special Assessment:** $100

*Refers only to possible term of incarceration, supervised release and fines. It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.